[No. 43054.    En Banc.    December 31, 1975.]

JOHN F. BROWN, JR., ET AL, *Appellants*, V. MACPHERSON'S, INC., ET AL, *Appellants*, THE STATE OF WASHINGTON, *Respondent.*

*Karr, Tuttle, Koch, Campbell, Mawer & Morrow,* by *Robert P. Piper, Krutch, Lindell, Donnelly, Dempcy & Lageschulte,* by *Richard F. Krutch* and *Jerome R. Cronk,* and *Olwell, Boyle & Hattrup,* by *Lee Olwell,* for appellants MacPherson's, Inc., et al.

*Slade Gorton, Attorney General,* and *Angelo R. Petruss, Assistant,* for respondent.

UTTER, J.—These consolidated lawsuits were filed to recover damages for the loss of life and property that resulted from an avalanche in the Yodelin area of Stevens Pass in early 1971. They name as defendants Nason Properties and Wendell Carlson, the owners and developers of the Yodelin area; MacPherson's, Inc., and William MacPherson, the real estate brokers for the project; Chelan County, which approved the platting of the area and issued building permits for the development; and the State of Washington, whose real estate division of the Department of Motor Vehicles acquired information regarding the avalanche danger in the area but allegedly failed to take proper action thereon.

Shortly before the cases came to trial, the State filed a motion to dismiss the claims against it under CR 12(b)(6), on the grounds that the plaintiffs' complaints did not state a claim upon which relief could be granted. The trial court granted this motion as to appellants Edgers, Dean, Stoen and Lunde, but denied it as to the other plaintiffs. On the original appeal from this ruling we upheld the trial court's action on the basis of our determination that the State's agents had no statutory duty or authority to act to prevent the injuries appellants incurred. *Brown v. MacPherson's, Inc.,* 85 Wn.2d 17, 530 P.2d 277 (1975). On rehearing we reverse the trial court, and hold that appellants could obtain relief if they can prove their allegation that the State's agents gratuitously assumed a duty to act on their behalf and then breached that duty to appellants' detriment.

Appellants' complaints provide only the briefest outline of their grounds for seeking damages from the State, alleging little beyond the three elements of negligence: duty, breach, and consequent damage. No one questions that appellants have been terribly damaged; the only issue raised by the State's dismissal motion is whether that damage could possibly be attributed to the breach of a duty owed them by the State or its agents. Essentially, the appellants claim that the State's agents breached three types of duty owed them: the common-law duties to act on a gratuitous promise and to act with care, and the statutory duty to carry out the functions assigned the real estate division by the provisions of RCW 18.85. We adhere to our determination in the original hearing of this appeal that the provisions of RCW 18.85 by themselves imposed no duty to appellants on the real estate division. But we hold that there is a possible state of facts, which appellants claim they can establish, under which the State could be found to have assumed a common-law duty to act on appellants' behalf and to act with care, and to have contributed to appellants' losses by failing to perform that duty.

These common-law theories of the State's liability are outlined in two portions of appellants' complaints. First, in their original pleadings appellants alleged that the State had wrongfully failed to convey information it had received regarding the risk of avalanches in the Yodelin area to those who it knew were endangered thereby. This allegation is contained in a paragraph of each complaint, of which the following excerpt from that of appellant Robert B. Edgers, executor of the estates of Kay Barton Edgers and Nancy Prentiss Edgers, is typical:

8. *Involvement of State of Washington.*
   The State of Washington was specifically warned of the extreme hazard of avalanche danger at the Yodelin development and, although it communicated such warning to Defendants MacPherson's, William MacPherson, Nason Properties and Wendell Carlson, it failed to give any such warning to the general public or the known owners and occupants of the Yodelin property and specif-

ically, failed to give such warning to the Edgers who the State knew or should have known from the information imparted to it to be in extreme danger of loss of their lives and property.

Second, appellants' complaints, as amended by motion of the trial court, included answers to an interrogatory by the State, which further described the State's allegedly tortious inaction and added the claim that the State's agents acted negligently in communicating with MacPherson's, Inc., further enhancing the danger to appellants. Again, the Edgers' answer is representative:

THE STATE OF WASHINGTON,

1. WHILE IT and its officials and agents:

a. Had specific knowledge of facts and circumstances showing that an extreme avalanche hazard existed in the area of the Edgers cabin at Yodelin, that winter time inhabitants thereof were in imminent danger and while its officials held the actual belief that such hazard existed

b. Had the authority, power and duty to intervene, give or require warnings, and prevent a disaster

c. Had given assurances to others that it would intervene which were relied upon

d. And while the Edgers and others similarly situated were justifiably complacent in the common belief that the State would not permit such a real estate development in a hazardous area

2. IT FAILED TO:

a. Give any warning thereof or to divulge any of the information it had regarding the danger to any of the Edgers household or to any other owners or inhabitants of the Yodelin Development

b. Require the realtor, MacPhersons, Inc., or the developer, Nason Properties, Inc., to warn the Edgers or other owners or inhabitants of Yodelin

c. Suspend, revoke or deny the license of MacPhersons, Inc., or to take other appropriate and authorized legal action against the realtor and/or developer

d. Complete its investigation of the avalanche hazard in a proper manner or to require adequate avalanche information from MacPhersons or Nason Properties

e. Adequately communicate with MacPhersons and Nason Properties and led them to believe that it had confidential information from which it was satisfied no

avalanche hazard existed—an impression upon which they relied to the ultimate detriment of the Edgers

On the basis of these pleadings alone it is extremely difficult to determine whether or not appellants have stated a claim against the State on which relief could be granted. On a CR 12(b)(6) motion, no matter outside the pleadings may be considered (*Stevens v. Murphy*, 69 Wn.2d 939, 421 P.2d 668 (1966)), and the court in ruling on it must proceed without examining depositions and affidavits which could show precisely what, if anything, the plaintiffs could possibly present to entitle them to the relief they seek. Ordinarily, whenever a complaint is facially adequate and the possibility of obtaining relief depends on the factual showing the plaintiff can make, a dismissal motion should be treated as a motion for summary judgment, if only to keep the court from having to act completely in the dark as to the actual nature of the plaintiff's cause of action.

Without the benefit of an actual factual showing, we can only speculate as to what, if anything, appellants might prove which would entitle them to relief. In order to prevent our speculations from straying too far from reality, however, the factual background of appellants' claim has been described informally and "hypothetically" by their counsel in argument here and the court below. We need not determine that the story related by counsel is true, or even that it is supported by some evidence, to use it as a context for consideration of the State's dismissal motion.[1] All we need decide is whether the facts described, if established, would entitle appellants to relief under the allegations in their complaints. If they would, they constitute a state of facts which would entitle appellants to relief, and would therefore be adequate to justify denial of the CR 12(b)(6) motion, which cannot be granted if *any* state of facts could

---

[1] Counsel for respondent stated in oral argument that the "hypothetical facts" presented by appellants are patently false. There is nothing in the record before us, however, which supports that claim. Appellants' counsel quoted portions of several affidavits and depositions in his briefs before the trial court which give credence to his version of the facts.

exist under which the plaintiff's claim could be sustained. *Cf. Callaway v. Hamilton Nat'l Bank,* 195 F.2d 556 (D.C. Cir. 1952).[2]

The relevant "hypothetical" factual basis of appellants' claim lies in an alleged series of communications between one Mr. Tonnon, an agent of the real estate division, Dr. Edward LaChapelle, a noted avalanche expert, and William MacPherson, the real estate broker of the Yodelin development. These began, appellants claim, when Dr. LaChapelle informed Mr. Tonnon that appellants' cabins were in a high-risk avalanche area, and Mr. Tonnon responded in a manner which led Dr. LaChapelle justifiably to believe that the division would deal with the matter and convey his warning to appellants, causing him to refrain from taking further action to warn appellants himself. Later, they say, Mr. Tonnon met with Mr. MacPherson and others, and led them to erroneously believe that his information indicated no avalanche danger existed, and the developers therefore did not act to protect appellants, either. Finally, appellants contend, the State terminated its involvement in the matter without informing them of the avalanche danger or Dr. LaChapelle of the fact that it was proceeding no further. As a result of all this, appellants claim they were deprived of the opportunity to be forwarned of their danger by either Dr. LaChapelle or Mr. MacPherson, and were thus unable

---

[2]Proper consideration of "hypothetical facts" does not deemphasize the distinction between motions under CR 12(b)(6) and summary judgment motions under CR 56. A summary judgment motion calls upon the court to determine from the pleadings and supporting documents whether any genuine issue of material fact exists requiring a trial. *Morris v. McNicol,* 83 Wn.2d 491, 519 P.2d 7 (1974). A CR 12(b)(6) motion questions only the legal sufficiency of the allegations in a pleading. But since this legal determination cannot always be made in a vacuum, it may be necessary to postulate factual situations which might form the basis for the pleading. No reason appears why one such "hypothetical" situation should not be that which the complaining party contends actually exists. The court need not find that any support for the alleged "facts" exists or would be admissible at trial, as it should on a summary judgment motion. The question under a CR 12(b)(6) motion is basically a legal one, and the "facts" are considered only as a conceptual backdrop for the legal determination.

to avoid the losses they suffered when the avalanche that had been predicted actually occurred.

In the context of this "hypothetical" factual background, appellants' complaints state possible causes of action against the State under two different theories of negligence. The first can be found in paragraphs 1(a) and (c) and 2(e) of the answers to interrogatory quoted above. There appellants allege essentially that the State's agents undertook to prevent the avalanche damage by conferring with MacPherson's, Inc., in effect to rescue appellants from their danger, but in the process of attempting to do so negligently misled Mr. MacPherson and thus made appellants' situation worse. We find that, if proven, the substance of these allegations would entitle appellants to relief on a theory of *misfeasance.*

One who undertakes, albeit gratuitously, to render aid to or warn a person in danger is required by our law to exercise reasonable care in his efforts, however commendable. *Jay v. Walla Walla College,* 53 Wn.2d 590, 595, 335 P.2d 458 (1959); *French v. Chase,* 48 Wn.2d 825, 830, 297 P.2d 235 (1956). If a rescuer fails to exercise such care and consequently increases the risk of harm to those he is trying to assist, he is liable for any physical damages he causes. *Spaulding v. United States,* 455 F.2d 222 (9th Cir. 1972); *Hill v. United States Fid. & Guar. Co.,* 428 F.2d 112 (5th Cir. 1970); *United States v. Gavagan,* 280 F.2d 319 (5th Cir. 1960); *Owl Drug Co. v. Crandall,* 52 Ariz. 322, 80 P.2d 952 (1938); *Zelanko v. Gimbel Bros.,* 158 Misc. 904, 287 N.Y.S. 134 (1935), *aff'd,* 247 App. Div. 867, 287 N.Y.S. 136 (1936); *Sheridan v. Aetna Cas. & Sur. Co.,* 3 Wn.2d 423, 437-39, 100 P.2d 1024 (1940); Restatement (Second) of Torts § 323(a) (1965); W. Prosser, *Torts* § 56 (4th ed. 1971). If the State's agents, acting out of concern for the safety of appellants and others similarly situated, negligently or intentionally conveyed the impression that the danger of avalanches was less than it was to Mr. MacPherson (or anyone else), causing him to refrain from action on appellants' behalf he otherwise would have taken,

the State is answerable for any damage caused by that misimpression.

Appellants' second theory of liability is contained in paragraph 8 of their original complaints and paragraphs 1 and 2(a) of their answers to interrogatory. It rests on the allegation that Dr. LaChapelle refrained from warning appellants of their danger, as he otherwise would have done, in reliance on the representation by the State's agents that they would take care of the matter. If proven, this representation and Dr. LaChapelle's reasonable reliance on it would create a duty to warn appellants which the State assumed but did not perform. Under this theory the State would be liable for its agents' *nonfeasance*.

The common law of torts has long distinguished between "acts" and "omissions," refusing to impose liability for the latter, even though the line between the two is far from easy to draw. *See* W. Prosser, *Torts* § 56, at 339-40 (4th ed. 1971). Persons who gratuitously promised to perform a service for another in need and failed to fulfill that promise were not held to account by ancient law. *See, e.g., Thorne v. Deas*, 14 N.Y. 84 (1809). But this harsh rule has been eroded along several lines, the most prominent of which involves promises which induce reliance, causing the promisee to refrain from seeking help elsewhere and thereby worsening his or her situation. This court recognized that inaction may create liability in such circumstances in *Sheridan v. Aetna Cas. & Sur. Co., supra.* There the defendant insurance company voluntarily undertook to inspect a hotel elevator and make periodic reports to the city on its safety; the hotel owners relied on the defendant and did not themselves make inspections. The reports were not made as required by ordinance and the elevator malfunctioned, injuring the plaintiff. The ordinance requiring the reports was held admissible to establish the extent of the assumed duty, and the omission in making them was therefore held to be a basis for the plaintiff's cause of action. *Sheridan v. Aetna Cas. & Sur. Co., supra* at 440.

Although we have not since directly addressed the ques-

tion of tortious omissions, other courts have continued to extend the duty to act imposed by reliance on a gratuitous promise. Even where an offer to seek or render aid is implicit and unspoken, a duty to make good on the promise has been found by most courts if it is reasonably relied upon. *Stanturf v. Sipes,* 447 S.W.2d 558 (Mo. 1969); *Wilmington Gen. Hosp. v. Manlove,* 54 Del. 15, 174 A.2d 135 (1961); *Abresch v. Northwestern Bell Tel. Co.,* 246 Minn. 408, 75 N.W.2d 206 (1956). In other cases a duty to act has been found to have been created by reliance not by the person to whom the aid is to be rendered, but by another who, as a result of the promise, refrains from acting on that person's behalf. In *Dudley v. Victor Lynn Lines, Inc.,* 48 N.J. Super. 457, 138 A.2d 53 (1958), *rev'd on other grounds,* 32 N.J. 479, 161 A.2d 479 (1960), the plaintiff's wife remained with plaintiff, who was ill, relying on the defendant's offer to seek medical help. Defendant broke his word and no help came; he was held liable for plaintiff's resultant death. *United States v. Gavagan, supra,* involved a promise by a Coast Guard officer to save a sinking boat. Because other boats might have rescued its crew had their owners not relied on this promise, the court decided that the government was liable to the estates of the men who drowned when the Coast Guard failed to act. In *Fair v. United States,* 234 F.2d 288 (5th Cir. 1956), a military officer told plaintiff's bodyguards he would warn them before a mental patient who had threatened her life was discharged from an Air Force hospital. The patient was released without the notification being given and killed the plaintiff; the government was held liable for the breach of its agent's promise. *See also Donald v. Garry,* 19 Cal. App. 3d 769, 97 Cal. Rptr. 191 (2d Dist. Ct. App. 1971); Restatement (Second) of Torts § 324A. (c) (1965); W. Prosser, *Torts* § 56, at 347 (4th ed. 1971).

■ The State argues, however, that its agents could not have assumed a duty to appellants because they had no power to do what they allegedly impliedly promised to do —warn appellants of their danger. In order to support this

claim it asks us to strictly construe the provisions of RCW 18.85 and hold that the powers of the real estate division and its agents are limited to those explicitly granted it in that chapter. We do not take so narrow a view the power of state officers. The authority given the division to investigate real estate brokers and to make the findings from such investigations available to the public (*see* RCW 34.04.020) implicitly includes the ability to communicate with interested or affected persons in the course or at the end of such investigations. This implicit power supplements the inherent power of all state officials to properly communicate with the public regarding matters of state business. *Cf. Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 833, 420 P.2d 698 (1966).

The legal authority of the State's agents to contact appellants thus was clear. But even if it were not, the State would be liable for its agents' failure to warn appellants of their danger if they had assumed a duty to do so within the scope of their employment. No special permission is necessary, either for public officials or private individuals, to warn others of some peril to them when a legal duty has been assumed to do so. The law does not require statutory authorization to inform a person that he or she is in mortal danger.

The issues in this case are in many ways similar to those in *Fair v. United States*, *supra*. There, too, the government argued that it could not be liable for its agents' failure to warn the decedent that her life was threatened because the agent had no express authority to give such warnings. The court in *Fair* rejected that contention and held that the powers of government officers are not so limited, that their legal responsibilities are not so different from those of private citizens. It ruled that the governmental agents can obligate themselves to act gratuitously on another's behalf and bind their employer to that obligation if it is made in the course of their employment. *Fair v. United States*, *supra* at 296. To hold otherwise would be to establish that, because of the finite statutory authority it gives its agents,

the government can escape responsibility for their breach of the moral and legal duty to keep their official word. We refuse to make such a rule here.

Reversed.

FINLEY, HAMILTON, BRACHTENBACH, and HOROWITZ, JJ., concur.

WRIGHT, J. (dissenting)—The majority's theory of recovery, whether based on common-law negligence or a statutory duty to warn of known dangers, must, in either instance, be underpinned by an agency relationship between the defendant State of Washington, and the state employees who, for purposes of the "hypothetical facts" under CR 12(b)(6) are deemed to have acted on behalf of the State of Washington. I do not dispute the majority's analysis regarding the liability of one who undertakes to render aid, but who executes the rescue or warning in a negligent manner. Further, I fully agree, in principle, with the majority's statement that

> the State would be liable for its agents' failure to warn appellants of their danger if they had assumed a duty to do so *within the scope of their employment.*

(Italics mine.) The last six words in the above statement are the most crucial in the opinion and it is that brief passage to which I dissent. I believe that under constitutional principles, this court is foreclosed from expanding the powers and jurisdiction of the Department of Motor Vehicles beyond the clear limitations imposed on that agency through the enabling statutes contained in RCW 18.85. The state employees were not within the scope of their employment and the assurances of Mr. Tonnon are no more than words spoken by one private citizen to another, *i.e.*, the alleged misguiding assurances to give warning cannot be viewed as being spoken on behalf of the State of Washington.

3 *Sutherland Statutory Construction* § 65.02 (4th ed. C. Sands 1974) states the rule regarding agency jurisdiction as follows at pages 149-50:

Since administrative agencies are purely creatures of legislation without inherent or common-law powers, the general rule applied to statutes granting powers to them is that only those powers are granted which are conferred either expressly or by necessary implication.

(Footnotes omitted.)

In the instant action, the only state agency involved is the real estate division of the Department of Motor Vehicles. The director's powers and duties are defined and limited by RCW 18.85.040, .085, and .090. The duty of the director is to regulate the activities of real estate brokers only. The means of regulating those persons is expressed in the above statutes and limited to the means of (a) conducting qualifying examinations for license issuance; (b) holding hearings regarding license revocation; and (c) formulating rules and regulations pertaining to professional conduct in general. Of course, any agency may acquire additional powers by necessary implication, but only if those additional powers are indispensable in executing the expressed purpose delegated to the agency by the legislature. In this aspect, caution and restraint must be exercised by courts. *State ex rel. Eastvold v. Maybury*, 49 Wn.2d 533, 304 P.2d 663 (1956) states at pages 539-40:

It is one thing to interpret the language of a statute to carry out the manifest intent of the legislature (in which category respondents' authorities fall), and an entirely different matter to add, by implication, to a statute which is complete in itself, simply because the result intended by the legislature may be doubtful in the minds of certain individuals.

. . . the language of this court in *State ex. rel. State Board of Medical Examiners v. Clausen*, 84 Wash. 279, 282, 146 Pac. 630 (1915), is pertinent:

"But where a person or board is charged by law with a specific duty, *and the means for its performance are appointed by law*, there is no room for implied powers, and the means appointed must be followed, *however inadequate may be the result*." (Italics ours.)

. . . If the statute, as written, produces a result which is thought to be inadequate . . . the remedy is with the legislature and not . . . the judiciary.

Again, in *Department of Labor & Indus. v. Cook*, 44 Wn.2d 671, 269 P.2d 962 (1954), it was stated at page 677:

But, whether the seeming lack of logic in this situation is the product of inadvertence or intention, the fact remains that the act lacks such a provision. The court cannot read into a statute anything which it may conceive that the legislature has unintentionally left out. *Seattle Ass'n of Credit Men v. General Motors Acceptance Corp.*, 188 Wash. 635, 63 P. (2d) 359; *Maryland Cas. Co. v. Tacoma*, 199 Wash. 384, 92 P. (2d) 203.

See also *Cole v. State Util. & Transp. Comm'n*, 79 Wn.2d 302, 485 P.2d 71 (1971); *Hansen Baking Co. v. Seattle*, 48 Wn.2d 737, 296 P.2d 670 (1956); *Karlen v. Department of Labor & Indus.*, 41 Wn.2d 301, 249 P.2d 364 (1952); *Northern Pac. Ry. v. Denney*, 155 Wash. 544, 285 P. 452 (1930); *Wishkah Boom Co. v. Greenwood Timber Co.*, 88 Wash. 568, 153 P. 367 (1915).

Being that the director of the Department of Motor Vehicles is charged with the duty of regulating real estate brokers only, and in view that the means for the performance of that duty is expressed in RCW 18.85.040, .085, and .090, we cannot, by judicial construction or by the doctrine of implied agency power, mutate that state agency into a different entity so as to charge it at the times here relevant with the responsibility of overseeing land development projects. The director was given such power in 1973. RCW 58.19.300.

A second approach to finding liability was briefly discussed by appellants and the majority, but mentioned in theory rather than by name. This second theory of recovery is based on the agency principle of "apparent or ostensible authority," or alternatively, on "agency by estoppel." Under the doctrine of "ostensible authority," a principal is liable for acts outside the express powers of the agent, where the principal, by its own acts, has placed the agent in the position that could reasonably be viewed by third persons as having the authorization by the principal, and as empowering the agent to act in the specific capacity that is

being disclaimed by the principal. That doctrine is based on the theory equivalent to the objective theory of contracts; namely, that one should ordinarily be bound by what he says (words or actions) rather than by what he secretly intends. Restatement (Second) of Agency § 8 (1958). A related rule is "agency by estoppel," which occurs when one intentionally or carelessly causes the belief in third persons that an act is committed on behalf of the estopped party. As a corollary to that rule, "estoppel by silence" exists where one knows that another is acting or will act under a misapprehension yet remains silent. Restatement (Second) of Agency § 8B, comment (b) (c) (1958).

In the case of a public entity, where its authority is limited by statute, which in itself is notice to the public, there is no rule of apparent authority or agency by estoppel and the public entity can only be bound to the extent of the true agency. G. Reinhard, *Law of Agency* § 472 (1902) states at page 549:

> A private agent might render his principal liable on mere appearances, or the principal might estop himself from denying the agent's authority by acts *in pais*; but this is not true of public agents; and the state or government cannot be bound by an estoppel *in pais* or by laches.

(Footnote omitted.) The reason for the distinction between private and public agents is simply based on the reason that there can be no misleading where the agent's instructions are a matter of public law. 1 W. Clark & H. Skyles, *Law of Agency* § 205 (1905) states at pages 478-79:

> Although a private agent, acting in violation of specific instructions, yet within the scope of a general authority, may bind his principal, the rule as to a like act of a public agent is otherwise. The specific definitions and limitations of the powers of a public agent are given by ordinances, orders of court, or by statute, and thus bear the character and force of public laws, ignorance of which can be presumed in favor of no one dealing with him on matters thus conditionally within his official discretion. For this reason the law makes a distinction between the effects of the acts of a public agent and those of a private agent. In the latter case, the extent of au-

'thority is necessarily known only to the principal and agent, while in the former, it is a matter of record in the books of the corporation or of public law, and the third party cannot plead ignorance thereof in order to bind the principal for acts done by the public agent in excess of his specific instructions.

(Footnote omitted.) And, in S. Steele, *The Law of Principal and Agent* § 85 (1909) it is stated at page 125:

The authority of a public officer to act in a particular transaction could be established only by showing that power to do the act, or make the contract, was expressly, or by necessary implication, conferred by law. Here, the authority is a matter of public record, and all persons are bound to take notice whether it exists at all and if so, what is its nature and extent.

(Footnotes omitted.)

An additional justification for the special rule in public agents rests in the purpose to protect the public treasury and taxpayer resource from possible fraud, mistake or folly, even if well meaning, of state employees acting on their own behest, rather than at the behest of the state. G. Reinhard, *Law of Agency* § 299 (1902) states at pages 294-95:

Concerning the duties, obligations and liabilities of these respective classes of agents to third persons, and the rights of third persons as against agents, a marked distinction must be observed. The authority of a public agent is generally conferred by statute or other public law, of which every one is bound to take notice; and the government or other public authority can not be bound by the acts of its agents, unless they be performed according to the power thus conferred, or unless the agent is held out as possessing such power, or is employed thus to represent his government or that division thereof for which he assumes to act. In cases of private agencies, on the other hand, the authority is not generally conferred by statutes or other public law, but by private contract, of which third parties can not be presumed to have actual knowledge; and the principals of such private agents are therefore held responsible, not only for the exercise of authority actually conferred, but for such also as they hold out their agents to appear to possess. This is so, as

stated by Story, "in order to guard the public against losses and injuries arising from the fraud or mistake, or rashness and indiscretion of their agents. And there is no hardship in requiring from private persons, dealing with public officers, the duty of inquiry, as to their real or apparent power and authority to bind the government."

And, at section 348, page 352:

Hence, when third parties deal with public agents, . . . they must know the powers of such agents or officials as they are contained in the city ordinances or other public law which contains the grant, and the legal effect thereof; and if they fail to do so, . . . they do so at their peril.

(Footnotes omitted.)

It is argued by the majority that a simple act on the part of the state, *i.e.*, telephoning and letter writing (see dissent in *Brown v. MacPherson's, Inc.*, 85 Wn.2d 17, 530 P.2d 277 (1975) ) could have avoided the accident and that this should militate toward liability. Not wishing to sound insensitive to the tremendous sense of loss appellants must feel, it must also be remembered that a simple inquiry into the public statutes would have revealed that the assurances given by Mr. Tonnon, an employee of the real estate division, to Dr. Edward LaChapelle, which assurances caused Dr. LaChapelle to refrain from taking further actions to warn appellants himself, were actions strictly between two private citizens. The assurances of Mr. Tonnon cannot be viewed as assurances by the State of Washington. In *Atlantic Tobacco Co. v. United States*, 249 F. Supp. 661 (D.S.C. 1966) the court held at page 663:

And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. [Citations omitted.]
. . . He who deals with an agent of the government must look to his authority, which will not be presumed but must be established. He cannot rely upon the scope of dealing or apparent authority as in the case of a private agent. [Citations omitted.]

Even when the State acts in a sphere traditionally occupied

by private principals, the rule requiring "agency in fact" still holds true and this is so even though hardship may result. In *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383-84, 92 L. Ed. 10, 68 S. Ct. 1, 175 A.L.R. 1075 (1947), the Supreme Court states the rule to be applied in transactions with agents of the government:

> The case no doubt presents phases of hardship. We take for granted that, on the basis of what they were told by the Corporation's local agent, the respondents reasonably believed that their entire crop was covered by petitioner's insurance. And so we assume that recovery could be had against a private insurance company. But the Corporation is not a private insurance company. It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, . . . Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it. The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends. [Citation omitted.] Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

(Footnote omitted.)

As a final matter, I wish to point out that all of the cases mentioned by the majority are distinguishable from the present case. In *Sheridan v. Aetna Cas. & Sur. Co.*, 3 Wn.2d 423, 100 P.2d 1024 (1940), the principal was a private corporation, which is subject to altogether different rules of agency liability. In *United States v. Gavagan*, 280 F.2d 319 (5th Cir. 1960), a government agency was involved, but the faulty promise to rescue was made pursuant to and within the scope of the actual authority of the agent, *i.e.*, the Coast Guard officer in charge of the rescue ship. The same is true with *Fair v. United States*, 234 F.2d 288 (5th Cir. 1956), in which the military officer failing to

warn of the release of the prisoner, had legal custody and jurisdiction of the mental patient. In this case, the Department of Motor Vehicles did not have the jurisdiction or power to regulate the development or adjacent avalanche chute. To convert that agency into a "watch-dog" type land-planning agency, when the legislature has clearly foreclosed such path of action, to me, is judicially impermissible.

STAFFORD, C.J., and ROSELLINI and HUNTER, JJ., concur with WRIGHT, J.

Petition for rehearing denied March 11, 1976.